## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
### (SOUTHERN DIVISION)

| | |
|---|---|
| **ROGERS MORGAN**<br>5904 Middleton Lane<br>Temple Hills, MD  20748-3730<br><br>**AND**<br><br>**PATRICE L. JOHNSON**<br>4935 Coronado Court<br>Waldorf, MD  20602-3184<br><br>*On behalf of themselves individually and on behalf of a Class and Subclass of similarly situated persons.*<br><br>*v.*<br><br>**CALIBER HOME LOANS, INC.**<br>3701 Regent Blvd.<br>Irving, TX  75063-2312<br><u>SERVE ON:</u><br>The Corporation Trust, Incorporated, Resident Agent<br>2405 York Road, Suite 201<br>Lutherville, MD  21093-2264<br><br>Defendant | Civil Case:<br><br>19-2797<br>_____<br><br><br><br>*JURY TRIAL DEMAND* |

## CLASS ACTION COMPLAINT

Plaintiff Rogers Morgan ("**Morgan**") and Plaintiff Patrice L. Johnson ("**Johnson**") ("collectively "**Plaintiffs**" or "**Named Plaintiffs**"), on their individual behalf and on behalf of a class and subclass of similarly situated individuals defined *infra*, by their attorneys, Phillip R. Robinson and the Consumer Law Center LLC and pursuant to Fed.R.Civ.P. 23 (Class Actions), sue Caliber Home Loans, Inc. ('Caliber" or "Defendant").  The Plaintiffs, on behalf of themselves and the

class and subclass members, demand a trial by Jury on all counts for which a right to trial by jury is allowed and, in support of their Class Action Complaint, state:

## INTRODUCTION

1.     In these instances, such as the underlying matters involving Caliber, the mortgage servicer places its interest and pattern of unsafe and unsound mortgage service practices above the remedial rights of homeowners and consumers.  Moreover, Caliber unfairly and deceptively ignores its statutory and contractual duties including those which were agreed to as part of their license to legally operate in the State of Maryland and nationwide.

2.     These practices are compounded when homeowners, like Johnson, Morgan, and the putative class members, try in good faith to resolve their situation and Caliber disregards its duty to conduct a reasonable investigation of their notices of error and makes material misstatements of law in reply which confirm the underlying claim in this matter—i.e. that Caliber as a pattern and practice violates its remedial, statutory duty pursuant to Real Estate Settlement Procedures Act, 12 U.S.C.A. § 2605(e)(3)("RESPA") which states:

> During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 1681a of Title 15).

*Id.*

3.     Under its authority granted to it pursuant to Dodd-Frank legislation, the Consumer Financial Protection Bureau ("CFPB") has further imposed this duty on Caliber and other services in 12 C.F.R. § 1024.35(i)(1)("After receipt of a notice of error, a servicer may not, for 60 days, furnish adverse information to any consumer reporting agency regarding any payment that is the subject of the notice of error").  However, as shown *supra*, Caliber has also failed its mandatory

duty to "comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter" which includes 12 C.F.R. § 1024.35(i)(1).   12 U.S.C.A. § 2605(k)(1)(E).

4.     There is no question that RESPA was intended and is considered remedial legislation. *See e.g. Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013)("As a remedial statute, RESPA is construed broadly to effectuate its purposes"); *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-66 (9th Cir. 2012)("RESPA's provisions relating to loan servicing procedures should be 'construed liberally' to serve the statute's remedial purpose").  *See also* DODD–FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT, PL 111-203, July 21, 2010, 124 Stat 1376.  Dodd-Frank was specifically enacted to "improv[e] accountability and transparency in the financial system…[and] to protect consumers from abusive financial services practices."  *Id.*

5.     Yet, as a matter of standard policy and practice, Caliber disregards the express requirements in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) to cease furnishing or providing adverse information to any consumer reporting agency regarding any payments or sums demanded due that are subject of the Qualified Written Requests/Notices of Error ("QWR/NOE") received from the Plaintiffs and Class members for a period of sixty days.  It simply continues the disputed, adverse reporting with knowing and reckless disregard to the rights of the Plaintiffs and Class members.

6.     In response to Morgan's QWR/NOE notice of error dated September 25, 2016 that Caliber received on October 3, 2016, Caliber, as part of its consistent policy, practice and pattern:

    a.     Did not correct its errors related to Morgan's mortgage account and continued to claim he owed it sums which he did not owe; and

   b.  Did not suppress the negative credit reporting information that was in dispute as it
       was required to do so 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

7.     In correspondence to Johnson dated March 7, 2019, that was in response to her
QWR/NOE (which it received on February 14, 1019), Caliber as part of its consistent policy, prac-
tice and pattern:

   a.  Acknowledged that Ms. Johnson requested that it suppress all negative reporting
       for the period of her dispute and thereafter Caliber's receipt of her QWR/NOE
       (which is not even a requirement of a borrower but is Caliber's mandatory duty);

   b.  Declined to grant Ms. Johnson's request to suppress the negative credit reporting
       information that was in dispute as it was required to do so 12 U.S.C.A. § 2605(e)(3)
       and 12 C.F.R. § 1024.35(i)(1); and

   c.  Explained as the basis of its policy and practice that its legal error that a different
       federal statute, i.e. the Fair Credit Reporting Act ("FCRA"), prevails over or
       preempts its duty under 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

8.     It is plain legal error for Caliber to disregard its duties under RESPA, i.e. 12
U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).  It is further plain error for it to manufacture
as pretext for not doing so, that another more general statute, i.e. the FCRA, governs instead.

9.     Congress has provided for limited preemption of state laws under the FCRA.  15
U.S.C.A. § 1681t.  However, it never expressed or implied any preemption of other federal states
like RESPA.  *See e.g. Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004)("One federal
statute does not preempt another... When two federal statutes address the same subject in different
ways, the right question is whether one implicitly repeals the other—and repeal by implication is
a rare bird indeed"); *Marshall v. CMRE Fin. Servs., Inc.*, No. SACV100668AGMLGX, 2010 WL

11595889, at *2 (C.D. Cal. Aug. 2, 2010)("Federal statutes do not 'preempt' other federal statutes" and finding that the FCRA does not preempt the Fair Debt Collection Practices Act ("FDCPA")).

10.     Further, it should be noted that 12 U.S.C.A. § 2605(e)(3) was first added to RESPA by Congress as part of the CRANSTON–GONZALEZ NATIONAL AFFORDABLE HOUSING ACT, PL 101–625, November 28, 1990, 104 Stat 4079 which is more recent than Congress' enactment of the FCRA in 1968 in UNITED STATES STATUTES AT LARGE, PL 90-321, May 29, 1968, 82 Stat. 146.

11.     12 C.F.R. § 1024.35(i)(1) was promulgated by the CFPB in a Final Rule that became effective on January 10, 2014.  *See* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 FR 10696-01.  In issuing its Final Rule the CFPB explained:

> Industry commenters strongly objected to the 60-day reporting prohibition. Commenters said the proposal undermines the accuracy and integrity of credit reports. One commenter said the Fair Credit Reporting Act already governs credit reporting. One large bank commenter asserted that because credit reporting is a safety and soundness protection, banks have a duty to accurately report delinquencies. Several industry commenters also noted a concern that, based on prior experience, borrowers may use the reporting prohibition to manipulate the system by disputing legitimate delinquencies in order to apply for credit without derogatory marks on credit reports. The Bureau acknowledges the concerns expressed but notes that Congress specifically imposed the 60-day reporting prohibition with respect to qualified written requests in section 6(e) of RESPA. As discussed above, **the Bureau believes it is necessary to achieve the consumer protection purposes of RESPA, including to ensure responsiveness to borrower requests and complaints and the provision of accurate and relevant information to borrowers, to apply the same procedures to all notices of error as applicable to qualified written requests.** Otherwise, borrowers and servicers must expend wasteful resources parsing the form requirements applicable to qualified written requests and navigating between two separate regulatory regimes. As detailed above, the Bureau believes that the interests of borrowers and servicers are best served and the purposes of RESPA are best met through a single regulatory regime applicable to both qualified written requests and other notices of error. The Bureau is therefore adopting § 1024.35(i)(1) as proposed, as it is consistent with the 60-day reporting prohibition for qualified written requests required by section 6(e) of RESPA.

*Id.* at 10752 (emphasis added).

12.     As a direct and proximate result of Caliber's violations of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Plaintiffs and the class members have been proximately harmed by Caliber's publishing of derogatory information to the credit reporting agencies subject to disputes regarding the borrower's payments and sums claimed due.  It was not permitted as a matter of law to report such information but did so anyway in disregard of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).   These damages include statutory damages available pursuant to 12 U.S.C.A. § 2605(f).

<h3 align="center">JURISDICTION AND VENUE</h3>

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 since certain of the claims asserted herein arise under the laws of the United States.  The Court also has supplement jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

14.     The Court has declaratory judgment authority pursuant to 28 U.S.C. § 2201, Fed.R.Civ.P. 57, CTS & JUD. PROC. § 3-409, and Fed.R.Civ.P. 23(c)(4).

15.     Venue is proper in this Court as the acts and conduct alleged all occurred in Maryland.

<h3 align="center">PARTIES</h3>

16.      Plaintiff Rogers Morgan ("**Morgan**") is a natural person who owns and resides at 5904 Middleton Lane, Temple Hills, Maryland (20748) ("Morgan Property").  Morgan has resided at the Morgan Property at all times relevant and material to this action as his personal residence.

17.     Plaintiff Patrice Johnson ("**Johnson**") is a natural person who owns and resides at 4935 Coronado Court, Waldorf, MD  (20602) ("**Johnson Property**").  Johnson has resided at the Johnson Property at all times relevant and material to this action as her personal residence.

18.     Defendant Caliber is a collector and a licensed mortgage servicer in the State of Maryland (NMLS Lic. No. 1904).  Caliber is also part of a large family of private equity funds acquired and owned by Lone Star Funds ("Lone Star"), a leading private equity firm, which has organized sixteen private equity funds (the "Funds") that are (i) structured as closed-end, private-equity limited partnerships and (ii) include limited partners such as corporate and public pension funds, sovereign wealth funds, university endowments, foundations, fund of funds and high net worth individuals.[1]  Caliber qualifies as a mortgage servicer pursuant to 12 C.F.R. § 1024.2 since it holds and is responsible for the servicing Johnson's federally related mortgage loan (as that term is defined by 12 U.S.C.A. § 2602(1)) and previously held and was responsible for the servicing of Morgan's federally related mortgage (as that term is defined by 12 U.S.C.A. § 2602(1)).

## FACTUAL ALLEGATIONS

### *General Allegations About Caliber's Legal Knowledge*

---

[1]     *See*    "About    Lone    Star    Funds"    description    available    at http://www.lonestarfunds.com/about-us/ (last visited July 31, 2019); "Specialty Management Firms" description from Hudson Advisors LP available at http://www.hudson-advisors.com/specialty-management-firms/ (last visited July 31, 2019); "Lone Star Fund IX" description available at http://www.lonestarfunds.com/funds-raised/capital-growth/lone-star-fund-ix/ (last visited July 31, 2019). *See also* Hudson America L.P., Part 2A of Form ADV, the Brochure available at http://www.adviserinfo.sec.gov/ as part of Hudson's legally required filings as a Registered Advisor with the SEC (last visited May 3, 2016) at Page 3 (Hudson "and [its] affiliates "provide investment advisory and related services to a family of closed-end, privately-offered funds (the "Funds")...[including] Lone Star Fund IX"); Page 4 ("The Funds [including LSF9] invest in a broad range of financial and other investment assets, subject to the terms of each Fund's Offering Documents. These assets include, but are not limited to...single family residential real estate-secured debt...and consumer debt"); Pages 13-14 ("the Funds' opportunistic investment strategy focuses on the expected returns of each potential investment on an individual basis"); Page 14 ("The Funds may make investments in secured and unsecured non-performing loans or other troubled assets that involve a significant degree of legal and financial risk and, particularly in the international context, political risks").

19.    All persons, including licensed mortgage lender/servicers in the State of Maryland like Caliber, are expected to know the law.  As part of its license to even conduct business in the State of Maryland Caliber "has a duty of good faith and fair dealing in communications, transactions, and course of dealings with a borrower in connection with the advertisement, solicitation, making, servicing, purchase, or sale of any mortgage loan." MD. CODE REGS. 09.03.06.20.  Johnson, Morgan, and other borrowers with whom Caliber has a relationship as a licensed Maryland lender/servicer are third party beneficiaries of MD. CODE REGS. 09.03.06.20.

20.    The Court of Appeals in 2005 recognized that a real estate professional who had no direct communication with a borrower nevertheless had a duty to a consumer under the Maryland Consumer Protection Act and Maryland common law to make a "reasonable investigation" of the true facts in the real estate transaction on which the borrower (and other parties) would rely in order to complete the transaction.  *Hoffman v. Stamper*, 385 Md. 1, 867 A.2d 276 (2005).  This duty of care applies to Caliber as its work involves secured, consumer mortgage loans subject to Maryland and Federal laws like RESPA.

21.    Pursuant to 12 U.S.C.A. § 2605(k)(1)(C)(E), Caliber has a duty to the Plaintiffs and Class members to (i) take appropriate steps to avoid foreclosure as part of its standard servicer's duties and (ii) comply with any other obligation(s) found by the CFPB, by regulation, to be appropriate to carry out the consumer protection purposes of 12 U.S.C.A. § 2605.

22.    Pursuant to 12 C.F.R. § 1024.38(b)(1)(i), Caliber is required to "[p]rovide accurate and timely disclosures to a borrower as required by [12 C.F.R. § 1024.38] or other applicable law." Pursuant to 12 C.F.R. § 1024.35(b)(5), Caliber is not permitted to "impos[e]… a fee or charge that

the servicer lacks a reasonable basis to impose upon the borrower." It is unreasonable and a violation of its duties for Caliber to demand payments and sums, fees and charges from borrowers that it is prohibited from imposing in the first instance by contract and by law.

23.    The Maryland Mortgage Fraud Protection Act, REAL PROP. § 7-401, *et seq.*, establishes a statutory duty upon Caliber to disclose to mortgage borrowers and homeowners the material information with respect to the mortgage lending process in an honest and truthful manner. *Ademiluyi v. PennyMac Mortgage Inv. Trust Holdings I, LLC*, 929 F. Supp. 2d 502, 531 (D. Md. 2013); *Castle v. Capital One, N.A.*, No. CIV.A. WMN-13-1830, 2014 WL 176790, at *5 (D. Md. Jan. 15, 2014; *Stovall v. SunTrust Mortgage, Inc.*, No. CIV.A. RDB-10-2836, 2011 WL 4402680 (D. Md. Sept. 20, 2011).

24.    Caliber's knowledge is also represented by the standard and uniform Deeds of Trust securing its interest in the Johnson Property, Morgan Property, and properties of the putative class members. Each of those standard deeds of trust or mortgage incorporate as material terms of their agreements RESPA and its implementing regulations.

### Factual Allegations About the Credit Reporting System

25.    In July 2019 the CFPB issued a report, *Building a Bridge to Credit Visibility*, which explained disputed credit reporting can have material impact on vulnerable consumers.

> The ability to access credit is a critical component for families and individuals nationwide to have the opportunity to climb the economic ladder, exercise informed consumer choice, build wealth, and achieve economic stability. During this panel, a panelist representing UnidosUS, a Latino nonprofit organization, explained that access to credit can affect consumers' daily lives in many ways, and often means the difference between economic opportunity and fragility. According to this panelist, access to credit affects where consumers reside, work, and go to school; it may also have lasting generational effects.

*Id.* at Page 7.

9

26.     Previously the Board of Governors of the Federal Reserve System's 2007 "Report to Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit" explained:

> Inaccurate data may cause some consumers to pay more, or less, for credit than is warranted by their true circumstances. For the full benefits of the credit-reporting system to be realized, credit records must be reasonably complete and accurate. Yet, under the country's voluntary system of credit reporting, complete information is not always reported to the credit-reporting system. Moreover, data accuracy is an issue under any credit-reporting system. The accuracy of the data affects both credit scoring and judgmental evaluations because both techniques rely on the quality of the information included in credit reports. Judgmental underwriting, which requires a loan officer's individual attention to an application, provides an opportunity to identify inaccuracies that credit scoring does not.

*Id.* at Page 17.

27.     To help address and avoid the specific, negative consequences of continued, negative reporting by mortgage services (similar to those described in the preceding paragraphs) that are subject to borrower QWR/NOEs, Congress and the CFPB enacted a specific tool in the toolbox of rights and remedies in favor of borrowers—i.e. 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).  In plain language the CFPB explains the protection to the Plaintiffs and Class members as follows on its website:

> Q. Can my mortgage servicer report negative information about me to a credit-reporting agency after I have sent an error dispute or information request?
>
> > A.  It depends. If your notice of error is in regards to a payment, your servicer can't provide negative information about that payment to any consumer reporting agency or credit bureau for the 60 days after it receives your notice of error.

https://www.consumerfinance.gov/ask-cfpb/can-my-mortgage-servicer-report-negative-information-about-me-to-a-credit-reporting-agency-after-i-have-sent-an-error-dispute-or-information-request-en-209/ (last visited July 27, 2019).

### *Factual Allegations Relevant to Plaintiff Morgan*

28.    On or about July 20, 1994, Morgan acquired the Morgan Property, by Deed recorded in the land records for Prince George's County (Book 9736, Page: 80).

29.    On June 25, 1998 Plaintiff borrowed the sum of $126,286.70 from NationsBank, NA in the form of a Simple Interest Fixed Rate Promissory Note ("Morgan Loan") for the purposes of refinancing his prior loan.  The Morgan Loan terms provided for 179 monthly principal and interest payments of $1,155.41 commencing August 1998 followed by a single, final principal and interest payment of $1,154.56 due in July 2013.  The total 180 monthly payments means the Morgan Loan had a term of just 15 years.  NationsBank and Mr. Morgan agreed to a written modification of the Loan on November 28, 1998 which changed the monthly payment due date from the 9th of the month to the 28th of the month for each payment period.  No other modifications of Morgan Loan were ever agreed to by the parties to the Morgan Loan.

30.    The Morgan Loan was utilized by Morgan exclusively for personal purposes to refinance the prior loan on the Morgan Property, pay other consumer debts and other consumer purposes.

31.    NationsBank, NA would later merge and rebrand to become Bank of America, NA. Bank of America, NA then became the servicer of the Morgan Loan.

32.    Morgan made all the payments (and more) required of him pursuant to the terms of the Morgan Loan.  However, on or about May 8, 2015 Bank of America sold the Morgan Loan to LSF9 and Caliber became the servicer of the Morgan Loan about the same time.  Thereafter Caliber claimed to Morgan that he owed it various sums of money which he disputed and it threatened him with foreclosure and other debt collection activities even though the loan term had expired and Morgan had made all required payments.  In one instance Caliber claimed that Morgan owed more

than $16,000; and in another it claimed he owed more than $30,000 even though the loan term had expired.

33.     Caliber threatened Morgan upon receipt of the loan that he owed sums to it related to the Morgan Loan (whose 15 year term had expired) and it continued reporting to the credit reporting agencies that he owed various sums on money and was otherwise past due on those sums which negatively impacted his employment situation.  Specifically, Morgan was then employed by the District of Columbia at the United Medical Center (1310 Southern Ave., SE, Washington, DC 20032).  As part of his employment agreement, the District of Columbia human resources agency would from time to time review Morgan's credit files to ensure he was qualified to retain his employment.  From 2015 through 2016 the human resources offices office expressed concerns to Morgan about the credit reporting by Caliber which created the appearance that he was vulnerable to exploitation and/or risky employee for the kind of work he was undertaking for the District of Columbia.  Morgan attempted to explain to the human resources officer(s) that he did not owe the sums claimed he was notified that he was still at risk of losing his employment because of the continued reporting from Caliber that gave the appearance he has not resolving the issue.

34.     Because of the continued disputes and reporting that he allegedly owed sums on the Mortgage Loan that were not owned, Morgan sent Caliber his written September 25, 2016 QWR/NOE to the address it published for such correspondence notifying it of its errors.  In this correspondence he specifically informed Caliber that the incorrect reporting by Caliber "[was] effecting [his] employment.  Please correct your records."

35.     In fact Morgan owed nothing to Caliber since he had paid all sums due on the Morgan Loan during the loan period.

36.    On October 4, 2016 Caliber acknowledged receiving Morgan's September 25, 2016 QWR/NOE on October 3, 2016 and expressly treated the correspondence as subject to RESPA.

37.    In violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Caliber furnished adverse information to the credit reporting agency known as TransUnion LLC regarding payments subject to Morgan's QWR/NOE (including that any sums were even due).  It furnished this adverse information on or about October 20, 2016 and November 20, 2016 (which were within sixty days of Caliber's receipt of Morgan's QWR/NOE).

38.    In violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Caliber furnished adverse information to the credit reporting agency known as Equifax Information Services, LLC regarding payments subject to Morgan's QWR/NOE (including that any sums were even due).  It furnished this adverse information on or about October 20, 2016 and November 20, 2016 (which were within sixty days of Caliber's receipt of Morgan's QWR/NOE).

39.    In violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Caliber furnished adverse information to the credit reporting agency known as Experian Information Services Inc. regarding payments subject to Morgan's QWR/NOE (including that any sums were even due).  It furnished this adverse information on or about October 20, 2016 and November 20, 2016 (which were within sixty days of Caliber's receipt of Morgan's QWR/NOE).

40.    Morgan has been harmed as a result of Caliber's acts and omissions described herein and that harm includes economic and non-economic damages in the form of emotional distress damages manifested by frustration, fear, mental distress, anxiety, and worry.  More specifically he reasonably feared Caliber's continued reporting, which it did not cease to report for the

sixty days following receipt of Morgan's QWR/NOE, would negatively impact his continued employment with the District of Columbia.  Morgan is also entitled to certain statutory damages under the claims asserted herein.

### *Factual Allegations Relevant to Plaintiff Johnson*

41.     On or about August 2, 2016, Johnson acquired the Johnson Property from Caliber's affiliate, i.e. U.S. Bank Trust N.A., as Trustee for LSF9 Master Participation Trust ("LSF9"), by Special Warranty Deed recorded in the land records for Charles County (Book 9527, Page: 142). LSF9 had acquired the Johnson Property less than a year before on October 13, 2015 for the sum of $274,500.

42.     To acquire the Johnson Property, Johnson financed the transaction with a purchase money loan advanced by Caliber for the sum of $310,276.00 ("Johnson Loan").  As security for the Johnson Loan, Johnson agreed to a Deed of Trust which is recorded in the land records of Charles County (Book 9527, Page: 148).  The Deed of Trust related to the Johnson Loan specifically incorporates RESPA and its implementing regulations, as amended from time to time, as specific contractual terms.  *See e.g. Id.* at ¶¶ (J), (Q), 3, 14, 15, 19.

43.     As a result, Caliber's affiliate, LSF9 realized a profit of $31,889.37 from the proceeds of Johnson's purchase of the Johnson Property from the time it acquired proper by foreclosure sale; however, its profits were significantly more than that sum since it acquired its interest in the loan it foreclosed upon for pennies on the dollar of what was claimed owed and thereby Caliber's affiliate likely profited from the transaction a total sum in excess of $100,000.  And by flipping the Johnson Property to Johnson through Caliber, the Lone Star Funds entities will earn further profits over time by the collection of payments from Johnson related to the Johnson Loan.

44.    The Johnson Loan was utilized by Johnson exclusively for personal purposes to acquire the Johnson Property where she lives with her family.

45.    Due to an unexpected reduction of household income, Johnson fell behind on her payments due on the Johnson Loan on about December 2017.  However, after not being able to bring the loan current by other means for a period of time, Johnson exercised her rights pursuant to the loss mitigation guidelines governing the Johnson Loan to apply for a loan modification to mitigate the situation on or about September 12, 2018 ("Johnson RMA").   As part of the Johnson RMA, Johnson provided Caliber, acting as her mortgage servicer, with all the information it requested that was in her possession and control and even some other information from public records and available to any other person including Caliber.

46.    Caliber received the Johnson RMA and determined that it was complete and thereafter reviewed it to determine if Johnson qualified for a loan modification pursuant to the guidelines governing the Johnson Loan.

47.    Based upon her complete application and the guidelines governing the Johnson Loan, Caliber approved Johnson for a Trial Payment Plan ("TPP") and loan modification on October 1, 2018.  The only conditions imposed by Caliber for its offer to Johnson of a TPP were:

    a.    For Johnson to notify Caliber by October 21, 2018 that she would accept the offer;

    b.    For Johnson to make three, on-time trial payments in the amount of $1,866.00 on or before November 1, 2018, December 1, 2019, and January 1, 2019; and

    c.    For Caliber to have a priority lien status for its modification and loan.

48.     Upon completion of the TPP and above conditions, Caliber promised in its October 1, 2018 correspondence to Johnson that "[o]nce you have successfully made each of the payments

by their due dates, you have submitted two signed copies of your modification agreement, and we have signed the modification agreement, your mortgage will be permanently modified in accordance with the terms of your modification agreement."

49.     Upon completion of the TPP and above conditions in ¶ 77, Caliber also promised in its October 1, 2018 correspondence to Johnson that "we will not refer your loan to foreclosure."

50.     Even though it was required to determine that Johnson was qualified for the Trial Payment Plan before even extending the offer to her, Caliber's October 1, 2018 TPP offer unfairly and deceptively reserved the right to revoke the offer after Johnson had relied upon it and satisfied all legitimate conditions.

51.     In reliance to Caliber's representations to her, including those in its October 1, 2018 correspondence, and in good faith, Johnson timely satisfied all the TPP conditions.

52.     However, in correspondence dated November 30, 2018, Caliber wrote to Johnson and unfairly and deceptively claimed that it needed Johnson's solar panel company, who had no legal interest in the Johnson Property, to subordinate its interest to Caliber in order to complete Johnson's final modification.  This misstatement and misrepresentation was unfair and deceptive because Johnson's solar panel company had no legal interest in the Johnson Property but simply had an interest in Johnson's solar panels which were installed after Johnson moved into the Johnson Property and were not permanent fixtures in the Johnson Property.

53.     Caliber's November 30, 2018 correspondence was further unfair and deceptive because it claimed Johnson's solar panel company's interest in the removable, fixtures only was that of a second, mortgage lien when as a matter of actual and public knowledge, Caliber knew that statement to false and misleading.

54.    Caliber's November 30, 2018 correspondence was further unfair and deceptive because it claimed Johnson's solar panel company's interest in the removable, fixtures had no priority over Caliber's real property lien and this statement is legally incorrect.

55.    Caliber's November 30, 2018 correspondence was further unfair and deceptive because as a matter of Maryland law, i.e. REAL PROP. ¶ 7-111, which governs Caliber's and Johnson's relationship, Caliber would retain a priority over anyone else through a modification of the loan and the guidelines governing Johnson's loan only require that a priority status in real property be maintained.

56.    On January 23, 2019, after Johnson had relied upon Caliber's TPP offer by making three timely payments on her TPP and also timely informing it of her acceptance, Caliber wrote to Johnson and falsely claimed Johnson had not complied with the TPP terms and therefore "[she] [was] not eligible to receive the loan modification [she] requested because [she] did not comply with the required terms."  The only denial reason stated was "UNRESOLVED TITLE ISSUES."

57.     In Caliber's January 23, 2019 denial letter, Caliber also stated to Johnson that she "[had] thirty (30) calendar days from the date of this notice to contact Caliber to discuss the reason for non-approval…Your loan may be referred to foreclosure during this time."

58.    Caliber's January 23, 2019 threat to refer Johnson to foreclosure during her appeal period of its wrongful denial of her loan modification was unfair, deceptive, and abusive because (i) it had a duty to mitigate damages and avoid further damages to Ms. Johnson by dual-tracking her to foreclosure during her loss mitigation appeal period (which was simply exasperating the threat of damages on Ms. Johnson) and (ii) Caliber was barred by 12 C.F.R. § 1024.41(g)(1) from referring Johnson and the Johnson Loan to foreclosure until the appeal period of her loss mitigation denial had concluded.

59.     In response to and in reliance on Caliber's seemingly pre-textual denial letter dated January 23, 2019 described ¶¶ 56-58 *supra*, Johnson sent Caliber: (i) her QWR/NOE on February 11, 2019; and (ii) a separate appeal of non-approval of her RMA seeking loss mitigation assistance. Each correspondence were sent by certified, pre-paid mail ($6.95 each) on February 11, 2019 to the addresses identified by Caliber to Johnson for it to receive (i) QWR/NOEs and (ii) loss mitigation appeals respectively.  Johnson incurred legal fees in the sum of $500 for assistance to understand her rights related to these issues as well.

60.     In further reliance to her agreement under the TPP terms as governed by the loss mitigation guidelines governing her loan, Johnson also continued to make the TPP monthly payments to Caliber.

61.     Caliber received Johnson's QWR/NOE on February 14, 2019 at the address it identified to Johnson for such correspondence.

62.     Caliber received Johnson's loss mitigation appeal on February 14, 2019 at the address it identified to Johnson for such correspondence.

63.     In her February 11, 2019 QWR/NOE, Johnson informed Caliber of its errors identified *supra* and asked it to correct its errors.  Johnson also asked Caliber to provide her with certain information including: (i) all reports or information relied upon by Caliber to claim the solar panels had an interest in the Johnson Property and not just the fixtures themselves; and (ii) an accounting of all sums imposed and collected by Caliber related to the Johnson Loan including convenience fees for accepting payment over the phone and property inspection fees.

64.     In her February 11, 2019 QWR/NOE, Johnson also requested that Caliber suppress all negative credit reporting to the credit reporting agencies during the disputed period covered by her February 11, 2019 QWR/NOE.  While Johnson was not required pursuant to RESPA to specify

this request, she did so because the continued derogatory reporting by Caliber to the CRAs was detrimental to Johnson's character and had a special threat to negatively infect her employment situation and relations by casting her in a false, negative light even though she was properly qualified for a loan modification, had complied with all the necessary conditions to obtain it, and had timely made all the required payments. Johnson legitimately feared this continued, negative reporting would interfere with her ability to sustain her employment (since her employer monitored the credit reporting related to her) and to also succeed with her modification notwithstanding the fact that she had done all she was required to do and Caliber's excuses were simply pretextual, unfair, abusive, and wrong. As a condition of her employment Johnson also had to report Caliber's continued negative reporting which caused her anxiety and worry about how it would affect her employment situation and ability to retain employment and pay her bills.

65.     In apparent response to her loss mitigation appeal, on March 7, 2019, Caliber sent Johnson her final, written Modification Agreement and stated as follows:

Dear PATRICE L JOHNSON:

**Congratulations!** You are eligible for a FHA Home Affordable Modification with Partial Claim. As previously described, if you comply with the terms of the FHA Home Affordable Modification with Partial Claim trial period plan. We will modify your mortgage loan and waive all prior late charges that remain unpaid.

The enclosed FHA Home Affordable Modification with Partial Claim Agreement ("*Modification Agreement*") reflects the proposed terms of your modified mortgage.

66.     Johnson timely complied with all of the conditions of the Final Modified Agreement dated March 7, 2019 and returned to Caliber all required papers with all the required signatures and notifications on or about March 26, 2019. Caliber countersigned the Final Modification Agreement on April 26, 2019 and thereafter caused it to be recorded in the land records for Charles County (Book: 10677; Page: 105).

67.     Also on March 7, 2019, Caliber partially responded in writing to Johnson's February 11, 2019 QWR/NOE. In that partial response, Caliber stated that it had "referred [Johnson and

the Johnson Property] to foreclosure on March 4, 2019." Caliber's referral to foreclosure under the circumstances of this case where: (i) Johnson had timely appealed her loss mitigation denial and Caliber had not yet responded to that appeal by March 4, 2019 and (ii) Caliber was prohibited by Maryland law and federal regulations from making such referral in the first instance is unfair, deceptive, and/or abusive since there is no point in Caliber running up the costs and fees to Johnson's account in this way and especially as shown *supra* Johnson's appeal of her wrongful loss mitigation denial was successful.

68.     As stated *supra*, Caliber's March 7, 2019 partial response to Johnson's QWR/NOE also declined to suppress negative reporting on Johnson's loan pursuant to its duties under 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) for the periods of time subject to her QWR/NOE. Rather, Caliber stated "[it] is required to report accurate information in accordance with the Fair Credit Reporting Act" and seemingly ignored its duties pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1). Caliber's statement as to the FCRA is also an incorrect statement of the law as it has no duty whatsoever to report any credit information to any credit reporting agency and it could choose to report no information all together; further, and material to this case, pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) Caliber actually has a duty to suppress furnishing adverse information to any consumer reporting agency regarding any payment that is the subject of a QWR/NOE.

69.     In violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Caliber furnished adverse information to the credit reporting agency known as TransUnion LLC regarding payments subject to Johnson's QWR/NOE (including the periods of October 2018 through January 2019). It furnished this adverse information on or about March

11, 2019 and April 11, 2019 (which were within sixty days of Caliber's receipt of Johnson's QWR/NOE).

70.    In violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Caliber furnished adverse information to the credit reporting agency known as Equifax Information Services, LLC regarding payments subject to Johnson's QWR/NOE (including the periods of October 2018 through January 2019). It furnished this adverse information on or about March 11, 2019 and April 11, 2019 (which were within sixty days of Caliber's receipt of Johnson's QWR/NOE).

71.    Upon information and belief based upon its communication with other credit reporting agencies and its own stated practice to Johnson, in violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Caliber furnished adverse information to the credit reporting agency known as Experian Information Solutions regarding payments subject to Johnson's QWR/NOE (including the periods of October 2018 through January 2019). It furnished this adverse information on or about March 11, 2019 and April 11, 2019 (which were within sixty days of Caliber's receipt of Johnson's QWR/NOE).

72.    Johnson has been harmed as a result of Caliber's acts and omissions described herein and that harm includes economic and non-economic damages in the form of emotional distress damages manifested by humiliation, fear, mental distress, anxiety, and worry. More specifically she reasonably feared Caliber's continued reporting, which it did not cease to report for the sixty days following receipt of her QWR/NOE, would negatively impact his continued employment. Johnson is also entitled to certain statutory damages under the claims asserted herein.

CLASS AND SUBCLASS ALLEGATIONS

73.     The Named Plaintiffs bring certain claims, *infra*, on behalf of a class of similarly situated persons related to Defendant Caliber under Fed.R.Civ.P. 23 ("**Caliber Class**"). The Plaintiffs propose, as the definition of the Caliber Class, that it be defined as follows:

> All residential loan borrowers for whom Caliber received a QWR/NOE in the three years immediately preceding this Class Action pursuant to 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.41. Excluded from the class are any borrowers who obtained a discharge under Chapter 7 of the Bankruptcy Code after the date Caliber received their QWR/NOE.

74.     Johnson and Morgan are the Named Plaintiffs for the Caliber Class.

75.     Named Plaintiff Johnson also brings certain declaratory claims, on behalf of a subclass of similarly situated persons related to Defendant Caliber under Fed.R.Civ.P. 23 ("**Caliber Subclass**"). Plaintiff Johnson proposes, as the definition of the Caliber Subclass, that it be defined as follows:

> All members of the Caliber Class who have a current borrower-servicer relationship with Caliber in relation to their residential, mortgage loan.

76.     Johnson is the Named Plaintiff for the Caliber Subclass.

77.     The Named Plaintiffs bring certain of their Caliber Class claims solely upon the basis of Fed.R.Civ.P. 23(c)(4) to determine certain issues on a class-wide basis including:

        a.      The issue of Caliber's liability for actual damages to the Caliber Class members under RESPA (to which they can proceed and pursue in separate individual actions).

        b.      The issue of whether the FCRA preempts or supercedes Caliber's duties pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

78.     The particular members of the Caliber Class and Caliber Subclass are capable of being described without difficult managerial or administrative problems. The members of the Caliber Class and Caliber Subclass are also readily identifiable from the information and records

in the possession or control of the Defendant or its affiliates and agents and from public records. Caliber is required to maintain this information for the entire class period. *See e.g.* Md. Code Regs. 09.03.06.04.

79.    The Caliber Class and Caliber Subclass members are sufficiently numerous, exceeding more than one hundred persons, that individual joinder of all members is impractical. This allegation is based on a data search of public records which identify that thousands of public complaints have been filed against Caliber and it services thousands of residential, mortgage loans throughout the United States and as a matter of public records in the State of Maryland alone, Caliber has an interests in hundreds of consumer, mortgage loans that were in default or believed to be in default during the class period in which borrowers would be most entitled and likely to utilize their rights pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

80.    There are questions of law and fact common to the Caliber Class and Caliber Subclass which predominate over any questions affecting only individual members of the Caliber Class or Caliber Subclass and, in fact, the wrongs alleged against the Defendant by the Caliber Class and Caliber Subclass members and the remedies sought by Named Plaintiffs and the Caliber Class and Caliber Subclass members against the Defendant are identical.

81.     These common questions of law are fact for the Caliber Class members include but are not limited to:

a.    whether Caliber has a legal duty to request the consumer reporting agencies to no report no derogatory credit reporting information about the Named Plaintiffs and Caliber Class members pursuant to 12 U.SCA. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1);

b.    whether Caliber has a duty to furnish any information about the Named Plaintiffs and Caliber Class members to the credit reporting agencies;

23

      c.      whether the FCRA preempts or control's Caliber's duties related to providing credit information about the Named Plaintiffs and Caliber Class members or whether the more specific and later enacted provisions of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) control;

      d.      whether Caliber's policy, practice, and procedure governing the suppression of disputed credit information in relation to the Named Plaintiffs' and the Caliber Class members' QWR/NOEs complies with its statutory duties (that are also incorporated into the contracts between it and the Plaintiff and Caliber Class members) stated in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1); and

      e.      whether Caliber's conduct fits a pattern and practice of 12 U.S.C.A. § 2605 violations (including violations of RESPA's implementing regulations).

82.      These common questions of law are fact for the Caliber Subclass members include but are not limited to:

      a.      Whether a controversy exists between Caliber and the Caliber Subclass concerning the rights and protections granted to Johnson and Caliber Subclass pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1);

      b.      Whether Caliber has a duty to furnish any information about the Named Plaintiffs and Caliber Subclass members to the credit reporting agencies;

      c.      Whether the FCRA preempts or control's Caliber's duties related to providing credit information about the Named Plaintiffs and Caliber Class members after receiving a QWR/NOE or whether the more specific and later enacted provisions of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) control; and

d.      Whether this Court may issue a declaration of law finding that the FCRA does not (i) conflict with or (ii) preempt 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

83.      Caliber's defenses (which defenses are denied) would be typical or identical for each of the member of the Caliber Class and Caliber Subclass and will be based on the same legal and factual theories.

84.      Certification of the Caliber Class and Caliber Subclass under Fed.R.Civ.P. 23 is appropriate as to the members of the Caliber Class and Caliber Subclass in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy.

85.      A class action will cause an orderly and expeditious administration of claims by the members of the Caliber Class and Caliber Subclass and economies of time, effort and expenses will be fostered and uniformity of decisions will be insured.

86.      The only individual questions concern the identification of members of the Caliber Class and Caliber Subclass.  This information can be determined by a ministerial examination of public records or from the Defendant's business records or other sources, which are admissible as an exception to the hearsay rule and as a statement by a party.  Named Plaintiffs do propose pursuant to Fed.R.Civ.P. 23(c)(4) for the Court to determine Caliber's liability for actual damages to the Caliber Class members so they may pursue those individual damages in separate actions as necessary or appropriate based on their individual circumstances.

87.      The Named Plaintiffs' claims are typical of the claims of the Caliber Class members pursuant to Fed.R.Civ.P. 23 since they are based on and arise out of identical facts constituting the wrongful conduct of the Defendant.  In addition, Johnson's claims are typical of the claims of the Caliber Subclass members pursuant to Fed.R.Civ.P. 23 since they also are based on and arise out

of identical facts constituting the wrongful conduct of the Defendant that is ongoing with current Caliber borrowers like her. Further, the Defendant has admitted to its standard practice and policy which (wrongfully) applies to all Caliber Class and Caliber Subclass members.

88.     Johnson and Morgan will also fairly and adequately represent and protect the interests of the Caliber Class. Johnson will also fairly and adequately represent and protect the interests of the Caliber Subclass. They are similarly situated with, and have suffered similar injuries as, the Caliber Class and Caliber Subclass members they seek to represent. They have also retained counsel experienced in consumer class actions including actions involving unlawful collection and mortgage servicing practices. Johnson and Morgan do not have any interests which might cause them not to vigorously prosecute this action or are otherwise adverse to the interests of the members of the Caliber Class Caliber Subclass. Both feel they and the Caliber Class and Caliber Subclass members have been wronged, wish to obtain redress of the wrong, and want Defendant stopped from failing to comply with its mandatory duties stated in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

89.     The Caliber Class members have suffered actual damages, losses, and harm similar those sustained by Johnson and Morgan described above. Johnson and Morgan do seek an award of statutory damages on behalf of the Caliber Class as well as their own individual, actual damages under the claims asserted herein. Johnson and Morgan also seek a determination of liability in favor of the Caliber Class members as to their individual, actual damages which can be pursued by the Caliber Class members on an individual basis in separate actions.

90.     The Caliber Subclass members have the same controversy as Johnson—that is whether their remedial rights under 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) will be protected or not or whether Caliber's claim that those rights give way to its duties under the

FCRA.  In light of this controversy, Johnson and Subclass members are entitled to a declaration of law resolving the legal issues.  This issue is important to Johnson and the Subclass members because Caliber continues to report the disputed information which should have been suppressed in accordance to Caliber's duties under 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) and/or they are still entitled to the remedial protections now and in the future and may require them again.

### COUNT I:  VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT ("RESPA"), 12 U.S.C.A. § 2605, 12 C.F.R. § 1024.41
**(On behalf of the Named Plaintiffs Individually and
on behalf of the Caliber Class)**

91.    The Named Plaintiffs adopt by reference the factual allegations contained in the preceding paragraphs of this Complaint with the same effect as if herein fully set forth.

92.     The Named Plaintiffs and Caliber Class members are "borrowers" entitled to the protections codified at 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.41.

93.    Caliber is a mortgage servicer subject to the mandatory requirements of 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.41 in relation to the Named Plaintiffs and Caliber Class members.

94.    Pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Caliber has legal duties to cease furnishing or providing adverse information to any consumer report-ing agency regarding any payments that are subject to QWR/NOEs from the Named Plaintiffs and Caliber Class members that it has received.

95.    The Named Plaintiffs and the Caliber Class members each sent Caliber QWR/NOEs concerning disputed payments and sums claimed due by Caliber.

96.    Caliber received those written QWR/NOEs at the addresses it published for such correspondence.

97.    In contravention of its mandatory duties pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) and as part of its pattern, practice, and custom during the three years proceeding the commencement of this action, Caliber did not suppress its credit reporting to the credit reporting agencies, including Experian, Equifax, and TransUnion, related to the period of times disputed by the Named Plaintiffs' and the Caliber Class members' QWR/NOEs.

98.    Rather, Caliber took the incorrect legal position that it could disregard its mandatory duties stated in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) in light of another federal statute—i.e. the FCRA.

99.    Upon information and belief, based upon the experiences of the Named Plaintiffs and the following facts and allegations, Caliber has a pattern and practice of noncompliance with the requirements of 12 U.S.C.A. § 2605 and its implementing regulations for borrowers like the Named Plaintiffs and Caliber Class members:

   a.    On July 19, 2017, Alfonzo and Sandra Gillis of 9729 Green Apple Turn in Upper Marlboro, Maryland 20772, sent a QWR/NOE to Caliber at the address it publishes for such correspondence concerning disputed payments and sums it had collected from them and/or were claiming was due.  Caliber received this correspondence on July 24, 2017 but did not suppress any credit reporting made by it to Equifax, Experian, and TransUnion concerning the Gillis' Loan related to the sums and payments for the 60 days following the receipt of their QWR/NOE.  Instead, Caliber continued furnishing to Experian, Equifax, and TransUnion the disputed and negative credit reporting information subject to the Gillis QWR/NOE in August 2017 and September 2017.

   b.    On January 31, 2017, Ronald Lewis of 8133 Grayden Lane in Brandywine, Maryland (20613), sent a QWR/NOE to Caliber at the address it publishes for such correspondence

concerning disputed sums it had collected from them and/or were claiming was due. Caliber received this correspondence on July 24, 2017 but did not suppress any credit reporting made by it to Equifax, Experian, and TransUnion concerning the Lewis Loan for the 60 days following the receipt of the QWR/NOE. Instead, Caliber continued furnishing to Experian, Equifax, and TransUnion the disputed and negative credit reporting information related to the sums and payments subject to the Lewis QWR/NOE in August 2017 and September 2017.

c.      On February 19, 2017, Marilyn Padmore of 7903 Longbranch Drive in New Carrollton, Maryland (20784), sent a QWR/NOE to Caliber at the address it publishes for such correspondence concerning disputed sums it had claimed to its successor were due. Caliber received this correspondence on February 23, 2018 but did not suppress any credit reporting made by it to Equifax, Experian, and TransUnion concerning the Padmore Loan for the 60 days following the receipt of the QWR/NOE. Instead, Caliber continued furnishing to Experian, Equifax, and TransUnion the disputed and negative credit reporting information related to the sums and payments subject to the Padmore QWR/NOE in March 2018 and April 2018.

d.      On February 5, 2017, Paula Hopson-Stanley of 7901 Quatrefoil Court in Bowie, Maryland (20720), sent a QWR/NOE to Caliber at the address it publishes for such correspondence concerning disputed payments Caliber lost and did not credit to her account. Caliber received this correspondence on February 13, 2017 but did not suppress any credit reporting made by it to Equifax, Experian, and TransUnion concerning the Hopson-Stanley Loan for the 60 days following the receipt of the QWR/NOE. Instead, Caliber continued furnishing to Experian, Equifax, and TransUnion the disputed and negative credit reporting information related to the sums and payments subject to the Hopson-Stanley QWR/NOE in March 2017 and April 2017.

e.    On January 28, 2017, Paulette Robinson formerly of 3326 Major Denton Drive in Beltsville, Maryland (20705), sent a QWR/NOE to Caliber at the address it publishes for such correspondence concerning disputed accounting by Caliber when it serviced her loan that had infected her relationship with her new mortgage servicer.  Caliber received this correspondence on February 3, 2017 but did not suppress any credit reporting made by it to Equifax, Experian, and TransUnion concerning the Robinson Loan for the 60 days following the receipt of the QWR/NOE. Instead, Caliber continued furnishing to Experian, Equifax, and TransUnion the disputed and negative credit reporting information subject to the Robinson QWR/NOE in February 2017 and March 2017.

f.    As of July 28, 2019 there are 3,364 public complaints against Caliber in the CFPB's complaint database which concern or related to its mortgage business.  Within those complaints are approximately 764 which concern problems with Caliber's loan servicing, escrow and accounting practices subject to and related to its responsibilities pursuant to RESPA and its implementing regulations.

100.    Each of the Named Plaintiffs and each Caliber Class member suffered nominal damages of no less than $5.00 to take the time and expense to send their QWR/NOE to Caliber which entitled them to certain rights—including those stated in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1)—which amount to actual damages since as part of Caliber's custom, practice, and policy it never seeks to suppress and negative, derogatory reporting to the credit reporting agencies when it receives a QWR/NOE.

**Count II:  DECLARATORY JUDGMENT**
**28 U.S.C. § 2201, Fed.R.Civ.P. 57, CTS & JUD. PROC. § 3-409, and**
**Fed.R.Civ.P. 23(c)(4)**
**(On behalf of the Named Plaintiff Johnson Individually and**
**on behalf of the Caliber Subclass)**

101.    The Named Plaintiff Johnson adopts by reference the factual allegations contained in the preceding paragraphs of this Complaint with the same effect as if herein fully set forth.  This Count is not brought on behalf of Named Plaintiff Morgan and is brought solely on behalf of Named Plaintiff Johnson on behalf of the Caliber Subclass members.

102.    By disregarding the remedial rights and protections for Named Plaintiff Johnson and the Caliber Subclass members stated in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) based on its legal error and misinterpretation of the FCRA, Caliber's policy and practice denies Named Plaintiff Johnson and the Caliber Subclass members with specific protections intended by Congress.

103.    Caliber believes that it is not required to comply with 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) because to do so would be to violate its duties under the FCRA and the FCRA otherwise preempts the protections stated in RESPA and Regulation X concerning credit reporting.  But neither the FCRA or RESPA and Regulation are in conflict with each other and longstanding practice would read the two statutes together to give effect to both.

104.    As a result of Caliber's practice and policy a controversy exists between Caliber and Named Plaintiff Johnson and the Caliber Subclass members to whether Johnson and the Caliber Subclass members are entitled to the protections stated in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

**PRAYER FOR RELIEF**

I.  WHEREFORE, Named Plaintiffs and Caliber Class members ask this Court to certify the Caliber Class pursuant to Fed.R.Civ.P. 23 and appoint the Named Plaintiffs as class representatives and the undersigned counsel as Class Counsel;

II.  WHEREFORE, Named Plaintiffs and Caliber Class members ask this Court to determine the issue of Caliber's liability to the Caliber Class members for awards of actual damages for its violations of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) pursuant to 12 U.S.C.A. § 2605(f)(2)(A) and Fed.R.Civ.P. 23(c)(4) to permit the Caliber Class members to pursue their actual damages, if any, in separate actions but to determine liability in favor of the Named Plaintiffs individually and award individual, actual damages in this action to them in the sum of $20,000 to each plaintiff;

III.  WHEREFORE, Named Plaintiffs and Caliber Class members ask this Court to determine the issue of Caliber's liability to the Named Plaintiffs and Caliber Class members for an award of statutory damages available pursuant to  awards of actual damages for its violations of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) pursuant to 12 U.S.C.A. § 2605(f)(2)(B)(i) in the sum of $1,000,000 since Caliber's net worth exceeds $100,000,000;

IV.  WHEREFORE, Named Plaintiffs and Caliber Class members ask this Court to award to costs and attorney fees to them and their undersigned counsel pursuant to 12 U.S.C.A. § 2605(f)(3);

V.  WHEREFORE, Named Plaintiffs and Caliber Class and Caliber Subclass members ask this Court, pursuant to 28 U.S.C. § 2201, Fed.R.Civ.P. 57, CTS & JUD. PROC. § 3-409, and Fed.R.Civ.P. 23(c)(4), to find and declare that Caliber's duties at law pursuant to 12 U.S.C.A. § 2605(e)(3) and 12

C.F.R. § 1024.35(i)(1) are not preempted or in conflict with the Caliber's

duties under the FCRA;

VI.  WHEREFORE, Named Plaintiffs and Caliber Class members ask this Court

to find and declare that Caliber's duties at law pursuant to 12 U.S.C.A. §

2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) are not preempted or in conflict

with the Caliber's duties at law pursuant to the FCRA;

VII.    WHEREFORE, Named Plaintiffs request the Court provide such other or

further relief as the Court deems appropriate including attorney fees and

costs in relation to Count of this Complaint.

Respectfully submitted,

*//s//Phillip R. Robinson*
Phillip R. Robinson
Bar No. 27824
Consumer Law Center LLC
8737 Colesville Road, Suite 308
Silver Spring, MD  20910
Phone (301) 448-1304